# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| DEBRA CHUISANO, as Legal | \* | |
| Representative of the Estate of | \* | No. 07-452V |
| FRANCES D'ESPOSITO, deceased, | \* | Special Master Christian J. |
| | \* | Moran |
| | \* | |
| Petitioner, | \* | |
| | \* | Filed: October 25, 2013 |
| v. | \* | |
| | \* | Attorneys' fees, reasonable |
| SECRETARY OF HEALTH | \* | basis, statute of limitations, |
| AND HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Robert T. Moxley, Robert T. Moxley, P.C., Cheyenne, WY, for petitioner;
Ronald C. Homer, Conway, Homer & Chin-Caplan, P.C., Boston, MA, former counsel of record for petitioner;
Glenn A. MacLeod, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]

Pending are two applications to pay petitioner's two attorneys, one current and one former. The Secretary opposes.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa—12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

The foundation for the fee applications is a petition alleging that a flu vaccine caused the death of petitioner's mother. Debra Chuisano, acting as the legal representative of the estate of Frances D'Esposito, sought compensation pursuant to the National Childhood Vaccine Injury Compensation Program. 42 U.S.C. § 300aa—10 et seq. (2012) ("Vaccine Act" or "Program"). Ms. Chuisano, however, did not meet her burden of proof and her case was dismissed. Decision, filed May 19, 2011.

The lack of recovery does not absolutely bar Ms. Chuisano from seeking reasonable attorneys' fees and costs incurred in pursuit of her unsuccessful claim. The Vaccine Acts permits (but does not require) an award of attorney fees "if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa—15(e)(1).[2]

Thus, the applicable issue is whether Ms. Chuisano had a reasonable basis for her claim that a flu vaccine caused Ms. D'Esposito's death. A primary challenge is that there is no definition of "reasonable basis." One permutation of this puzzle is whether a looming expiration of the statute of limitations should affect how special masters determine whether petitioner established "a reasonable basis for the claim for which the petition was brought."

As explained in more detail in section I.C. below, the pendency of the statute of limitations does not dispense with the petitioner's obligation to furnish some evidence supporting the claim contained in the petition. Admittedly, this holding is a change from the results reached in other cases, but this holding is tied more closely to the statute's text. Simply, the portion of the statute authorizing attorneys' fees refers to the petition. The portion of the statute defining what the petition shall contain refers to documentation supporting the claims in the petition. Thus, to have a reasonable basis, the petitioner must advance some documentation (meaning evidence) supporting the claims in the petition.

When Ms. Chuisano's case is measured against this standard, it is abundantly clear that she did not have a reasonable basis. She did not present any evidence supporting the claim in her petition, which was that the flu vaccine

---

[2] Ms. Chuisano's good faith is not contested. Thus, this decision discusses only "reasonable basis."

contributed to her mother's death. This gap in evidence remained despite Ms. Chuisano's retention of two separate law firms and the participation of at least three doctors. Without any evidence linking Ms. D'Esposito's death to her flu vaccination, Ms. Chuisano's case lacked a reasonable basis. And, without a reasonable basis, she may not be awarded any attorneys' fees.

## BACKGROUND

### Medical History[3]

Ms. D'Esposito was born in 1942. By 2004, she was suffering from chronic obstructive pulmonary disease and chronic asthma. Exhibit 4 (Bay Shore Allergy Group) at 1-2. She also had arthritis. Exhibit 1 at 16. On September 27, 2004, Ms. D'Esposito was diagnosed as suffering from an upper respiratory infection for which she was prescribed an antibiotic. Exhibit 3 at 4.

On October 12, 2004, Ms. D'Esposito was given a dose of the influenza ("flu") vaccine. Exhibit 4 at 17. Four days later, she had aches, fever, and a sore throat. Her primary care doctor diagnosed her as having a viral syndrome and did not prescribe more antibiotics. Exhibit 3 at 2.

On October 18, 2004, Ms. D'Esposito had difficulty breathing. Emergency medical services brought her to Good Samaritan Hospital. Histories from her admission mentioned that she had received the flu vaccine recently. Exhibit 5 at 13, 718. An initial diagnosis was that Ms. D'Esposito was infected with pneumonia and suffered from sepsis. Exhibit 5 at 729, 750. Laboratory tests detected streptococcus pneumonia. Exhibit 5 at 239.

Although Ms. D' Esposito remained in the hospital, her condition worsened. She died on December 24, 2004. The discharge summary indicates that the

---

[3] This chronology of Ms. D'Esposito's medical history, although not disputed, takes into account all the records filed regardless of when they were filed. As discussed below, Conway, Homer, & Chin-Caplan, P.C., ("CHC-C") did not necessarily know all this information about Ms. D'Esposito when they filed the petition.

diagnoses were pneumonia and congestive heart failure. Exhibit 5 at 4.[4] The death certificate states that the cause of death was adult respiratory distress syndrome due to pneumococcal pneumonia and sepsis. Exhibit 3 at 1.

## CHC-C Work before Filing Petition[5]

In early March 2005, Ms. Chuisano contacted CHC-C. In connection with efforts to schedule a conference with a CHC-C attorney, a paralegal requested that Ms. Chuisano "forward records and estate docs." At the subsequent meeting, a senior attorney spent about one hour with Ms. Chuisano. The next entry, for May 19, 2005, indicates that a paralegal spoke to Ms. Chuisano for about ten minutes about how Ms. Chuisano wanted to proceed with the case.

Following this conference, paralegals communicated with Ms. Chuisano about the status of medical records. Apparently, CHC-C expected that Ms. Chuisano would gather medical records and give the records to the law firm. For reasons not explained in the record, Ms. Chuisano did not. More than one year went by. By September 2006, a paralegal told an attorney that the firm had not heard from the client in the last three to four months. The firm sent a "reject letter" to their client.

After this letter, Ms. Chuisano told a paralegal that she did want to continue the case and would send in medical records. On December 21, 2006, a paralegal reviewed a discharge summary submitted by Ms. Chuisano.

The discharge summary provides the following information about Ms. D'Esposito:

> DIAGNOSES:
> 1. PNEUMONIA.
> 2. CONGESTIVE HEART FAILURE.

---

[4] Two discharge summaries appear in the records from Good Samaritan Hospital. Exhibit 5 at 3-4. The one at page 3 is probably a draft.

[5] Information about CHC-C's activities come from its timesheets. Exhibit 14.

> This patient was a 62-year old female who was admitted on October 18, 2004, with bilateral pneumonia, probable sepsis. . . . The patient was also found to be in acute renal failure. . . . The patient was vented in the intensive care unit. Initial cultures came back pneumococcal. . . . The patient's blood pressure dropped, and the patient became septic. The patient went into ARDS [adult respiratory distress syndrome] and had an episode of nonsustained ventricular tachycardia. . . . The patient continued in the intensive care unit, continued to remain poor over the next several weeks. . . . By November 20, 2004, the patient was awake, but lethargic, on the ventilator. By December 22, 2004, the patient's overall condition was unchanged. She continued to do poorly. There was felt to be no meaningful hope of recovery. . . . By December 24, 2004, the patient expired at 0625 hours.

Exhibit 5 at 4. This discharge report does not mention that Ms. D'Esposito received the flu vaccine. Rather, the discharge summary indicates that Ms. D'Esposito was infected by pneumococcal bacteria, suffered bilateral pneumonia, and died from congestive heart failure.

After the law firm received the discharge summary, CHC-C accepted the case pending estate documents. Over the next month, an attorney and a paralegal often communicated with Ms. Chuisano about estate documents. On February 26, 2007, the law firm received "admin of estate docs." See exhibit 20.

Within two weeks, a paralegal was requesting medical records. The paralegal's active pursuit of medical records in March 2007, differs from what was happening one year earlier. In March 2006, the law firm was waiting for Ms. Chuisano to get records. By March 2007, however, the responsibility had switched. CHC-C was attempting to gather records.

By June 2007, the law firm faced a situation in which the statute of limitations required Ms. Chuisano to file a petition by July 1, 2007.[6] See 42

---

[6] At the time, controlling precedent indicated that compliance with the statute of limitations was a jurisdictional issue and equitable tolling was not

<span style="float:right">(…continued)</span>

U.S.C. § 300aa—16(b) (discussing statute of limitations when the Vaccine Injury Table is revised); 70 Fed. Reg. 19092, 19093 (discussing deadline for filing petitions based upon the influenza vaccine).[7] Consequently, the law firm prepared a skeletal petition and filed it on Ms. Chuisano's behalf.

Before the law firm submitted the petition, which the Clerk's Office filed on June 28, 2007, CHC-C had obtained some medical records about Ms. D'Esposito. As mentioned above, on December 21, 2006, Ms. Chuisano provided the law firm with the discharge summary. On March 28, 2007, the law firm received medical records from Bayshore Allergy Group. On April 24, 2007, the law firm received medical records from East Islip Medical Associates. These medical records were not submitted in conjunction with the June 28, 2007 petition. The law firm also did not include an affidavit describing efforts to obtain missing documents.

The law firm's timesheets do not indicate any attorney reviewed these medical records before the petition was filed. The records from Bayshore Allergy Group told the attorney that in February 2004 (approximately eight months before the flu vaccination), a doctor stated that Ms. D'Esposito required a portable nebulizer because of "chronic and acute asthma." Exhibit 4 at 1 (capitalization changed without notation). The doctor also described Ms. D'Esposito's "pulmonary disease" as "very unstable." Id.

The discharge report, as discussed previously, informed the attorney that Ms. D'Esposito was admitted to the hospital with pneumonia and initial cultures indicated an infection with pneumococcal bacteria. The discharge report also informed the attorney that Ms. D'Esposito experienced congestive heart failure and adult respiratory distress syndrome before she died. The discharge report does not link Ms. D'Esposito's death to the flu vaccine. Exhibit 5 at 4.

---

permitted. Brice v. Sec'y of Health & Human Servs., 240 F.3d 1367 (Fed. Cir. 2001). In 2011, the en banc Federal Circuit overruled Brice. Cloer v. Sec'y of Health & Human Servs., 654 F.3d 1322 (Fed. Cir. 2011), cert. denied, 132 S.Ct. 1908 (2012).

[7] When the Secretary adds a vaccine, such as the flu vaccine, to the Vaccine Injury Table, a person may file a petition "not later than 2 years after the effective date of the revision, except . . . if (1) the vaccine-related death occurred more than 8 years before the date of the revisions of the table." 42 U.S.C. § 300aa—16(b).

## CHC-C Work after Filing Petition

Since CHC-C submitted the petition without any medical records, the law firm continued gathering medical records. To aid that effort, the law firm filed motions for authorization to issue subpoenas for missing medical records. The law firm received medical records in the second half of 2007. For example, on October 1, 2007, the law firm received four volumes of records from Good Samaritan Hospital. Starting in October 2007, the law firm's paralegal(s) spent hours in "stage 2" work.[8] On November 26, 2007, CHC-C submitted a compact disc containing five exhibits, including the records from Bayshore Allergy Group (exhibit 4) and East Islip Medical Associates (exhibit 2). These exhibits exceed 2,000 pages, of which most come from Good Samaritan Hospital.

On May 30, 2008, the Secretary filed her report pursuant to Vaccine Rule 4. The Secretary noted pertinent events in Ms. D'Esposito's medical history, including her multiple respiratory infections in 2002 through 2004; another respiratory infection on September 27, 2004, which was about two weeks before her flu vaccination on October 12, 2004; and the events recorded during Ms. D'Esposito's final hospitalization. In recounting Ms. D'Esposito's history, the Secretary argued that "[t]he death certificate constitutes a powerful piece of evidence concerning the cause of death in this case. The death certificate lists that Ms. D'Esposito died as a consequence of adult respiratory distress syndrome due to pneumococcal pneumonia and sepsis." Resp't Rep't at 7. In her analysis, the Secretary maintained that "none of her treating physicians ascribe Ms. D'Esposito's death to her receipt of the flu vaccine, although they were clearly

---

[8] Although not specifically explained in Ms. Chuisano's case, her attorneys in another case explained that a "stage 2" memo is a "comprehensive, detailed, accurate, and complete summary of a petitioner's past medical and/or educational, rehabilitation, physical therapy, psychological, or similar records." Hawkins v. Sec'y of Health & Human Servs., No. 00-646V, 2007 WL 5159581, at *1 (Fed. Cl. Spec. Mstr. April 30, 2007). While Ms. Chuisano's case was pending, another special master "reduce[d]all billing entries labeled merely 'stage 2' by 50 percent both because [she] [had] no idea how much of these entries [was] indeed billable, and to encourage counsel to document properly their billing hours in the future." Calise v. Sec'y of Health & Human Servs., No. 08-865V, 2011 WL 2444810, at *7 (Fed. Cl. Spec. Mstr. June 13, 2011).

aware that she had received a recent flu shot." Id. at 9. The Secretary's position was that "the medical records document that Ms. D'Esposito's unfortunate demise was the result of complications of sepsis stemming from infections, with pneumonia from streptococcus pneumoniae as the initial presenting infection."[9] Id. at 8. Ultimately, the Secretary recommended that compensation was not appropriate.

After the Secretary's report, CHC-C reinitiated the expert search. The law firm consulted Dr. Rosenstreich. During an October 28, 2008 status conference, Ms. Chuisano's attorney represented that the firm intended to retain an immunologist to present an expert report. The ensuing order set a December 30, 2008 deadline for this report.

CHC-C requested and received additional time to file an expert report. During this time, Ms. Chin-Caplan, one of Ms. Chuisano's attorneys, was taking the lead in researching different ideas about how a flu vaccine could have caused Ms. D'Esposito's death. Eventually, the law firm sent a letter, which is at least three single-spaced pages long, to Dr. Yehuda Shoenfeld. Dr. Shoenfeld, an internationally known immunologist, has appeared on behalf of petitioners in many cases in the Vaccine Program.

On May 20, 2009, Ms. Chin-Caplan spent 0.6 hours reviewing "draft expert report." Two days later, she spent 0.2 hours in a phone call with the expert. Additional emails among Ms. Chin-Caplan, a paralegal, and Dr. Shoenfeld were sent in June and July 2009.

On July 13, 2009, the deadline for filing an expert report, Ms. Chuisano filed her fourth motion for additional time to file an expert report. Ms. Chuisano represented that her attorneys had "recently received a preliminary opinion from Dr. Shoenfeld" and they required "additional time to discuss Dr. Shoenfeld's opinion with the petitioner." Ms. Chuisano requested an additional 30 days.

There were more communications. Ms. Chin-Caplan emailed Dr. Shoenfeld. Ms. Chin-Caplan wrote memos and a paralegal reviewed them. Ms. Chin-Caplan

---

[9] The Secretary also argued that the flu vaccine could not have contributed to the infections that led to sepsis because "[t]he flu vaccine does not contain live virus [and] cannot cause flu infection." Id.

8

and the paralegal met. Ms. Chin-Caplan telephoned Ms. Chuisano. The result was that the firm sent Ms. Chuisano a "reject letter." <u>See</u> entries for August 10 & 17, 2008.

On August 17, 2009, Mr. Homer filed a motion to withdraw as counsel of record. This motion asserted, incorrectly, that Ms. Chuisano "has entered her appearance as <u>pro</u> <u>se</u> petitioner." There was no action on this motion. On August 18, 2009, a paralegal spent 1.5 hours copying "all case materials, orders, exhibits, pleadings, etc for client."

In October and November 2009, CHC-C provided materials to Mr. Moxley for his review. On November 16, 2009, Mr. Homer filed a motion to substitute Mr. Moxley as attorney of record pursuant to Vaccine Rule 14(c). The Clerk's Office acted on this motion. <u>See</u> Rule 83.1(c)(4) of Rules of the Court of Federal Claims.

CHC-C stopped representing Ms. Chuisano on November 16, 2009. As of this date, the law firm (attorneys, paralegals and law clerks) had spent approximately 190 hours in representing her.[10]

## Mr. Moxley's Work in the Merits Phase[11]

On the day after CHC-C filed their motion to withdraw, Mr. Moxley had his "initial case consult." The consultation was with Ms. Chin-Caplan.[12] (The timesheet does not reference Ms. Chuisano.) In September and October 2009, Mr. Moxley or his paralegal spent some time reviewing case materials provided by

---

[10] CHC-C continued to monitor Ms. Chuisano's case through the court's electronic docket and, later, spent time preparing the pending fee application.

[11] The source of information about Mr. Moxley's activities is his timesheet, which was submitted as exhibit 10.

[12] CHC-C's timesheets do not include an entry for Ms. Chin-Caplan on August 18, 2009. However, Ms. Chin-Caplan records that she spoke to a "new attorney" on October 19, 2009.

CHC-C. Mr. Moxley's review specifically included Ms. Chin-Caplan's "letter re: medical theories." He had a telephone conference with Ms. Chin-Caplan on October 19, 2009.

Mr. Moxley became counsel of record on November 16, 2009. See docket entry 38. After Mr. Moxley became counsel of record, a paralegal in his office sent records to Dr. Levin in December 2009. In April 2010, Mr. Moxley twice emailed Dr. Levin. There are no other mentions of communications with Dr. Levin in Mr. Moxley's timesheet.

In September 2010, an order was issued requiring Ms. Chuisano to file a status report by October 29, 2010. In the ensuing status report, Ms. Chuisano stated that Mr. Moxley "has been actively seeking a medical expert to support the causation syllogism required by the Vaccine Act."[13] Ms. Chuisano also represented that she was pursuing a theory in which the "flu virus has been observed to disrupt the molecular processes of the immune system, and to promote a synergistic effect whereby other infections have a greater opportunity. Fatal pneumonia, for instance, is made much more likely." The status report stated that Mr. Moxley had not found an expert to provide this opinion.

Additional status reports were filed on December 1, 2010, and January 31, 2011. Another status conference was held on February 15, 2011. Ms. Chuisano was ordered to file an expert report by May 16, 2011, or to file a motion for a ruling on the record. Order, filed Feb. 15, 2011.

Ms. Chuisano filed a motion for a ruling on the record on May 16, 2011. A decision finding that Ms. Chuisano had not met her burden of proof was issued on May 18, 2011. A judgment concluding the merits phase of Ms. Chuisano's case was entered on June 20, 2011.

---

[13] Mr. Moxley's timesheets do not include any activity in the case from September 27, 2010 (email regarding a status report deadline) to December 1, 2010.

10

## Application for Attorneys' Fees and Costs and Related Pleadings

Still represented by Mr. Moxley, Ms. Chuisano filed the pending application for attorneys' fees and costs on December 16, 2011. Ms. Chuisano sought an award for work performed by Mr. Moxley and by her former attorneys at CHC-C.

In response, the Secretary argued that the special master should deny the application "in whole." Resp't Opp'n at 1. The Secretary argued that "[b]ased on the information in the record, no reasonable basis existed for the filing or maintaining of the petition in this case." Id. at 3. The Secretary's argument that no reasonable basis existed was premised upon an assertion that "[t]o have a 'reasonable basis,' petitioner's vaccine injury claim must, at a minimum, be supported either by the medical records submitted with the petition or by a medical opinion." Id. at 4 (citing 42 U.S.C. § 300aa—13(a)(1)). The Secretary also implied that Ms. Chuisano's attorneys failed to investigate her claims before they filed the petition on her behalf. Finally, if the special master were to find that reasonable basis supported Ms. Chuisano's petition, the Secretary questioned the amount requested in attorneys' fees and costs. Id. at 11-12.

Ms. Chuisano filed two reply briefs, one drafted by CHC-C and one drafted by Mr. Moxley. CHC-C's brief discusses reasonable basis extensively. According to this brief, Ms. Chuisano's case was supported by reasonable basis because Ms. Chin-Caplan researched the scientific material. The brief contains a lengthy quotation of a letter Ms. Chin-Caplan wrote to Dr. Shoenfeld in which Ms. Chin-Caplan set forth her ideas about how the flu vaccine could have contributed to Ms. D'Esposito's death. Exhibit 15 at 8-12.[14] For his part, Mr. Moxley stated, without any citation to evidence, that an expert validated Ms. Chin-Caplan's theory. Both law firms defended the amounts requested. Both law firms also increased the amount they were requesting in attorneys' fees to account for the time spent in addressing the Secretary's objections.

The Secretary filed a response and continued to argue that the case lacked a reasonable basis. The Secretary specifically challenged Ms. Chuisano's reliance on Ms. Chin-Caplan's letter: "Petitioner's counsel's own unsupported medical

---

[14] The record does not contain a complete copy of Ms. Chin-Caplan's letter to Dr. Shoenfeld.

11

theory does not suffice to give a reasonable basis to petitioner's claim." Resp't Reply, filed May 18, 2012, at 2.

On September 20, 2012, a decision awarding attorneys' fees and costs was issued. This decision held that the looming expiration of the statute of limitations was a factor in considering whether Ms. Chuisano's case was supported by reasonable basis when CHC-C represented her. In this context, the September 20, 2012 decision remarked that neither party had cited earlier special masters' decisions that had liberally construed the reasonable basis requirement and noted that "[t]he Secretary's view about the correctness of [those] cases . . . would have been helpful." Slip. op. at 12. Given this holding, "Ms. Chuisano [met] a standard for filing petitions on the eve of a deadline set by the statute of limitations." Slip. op. at 20. The reasonable basis extended for gathering medical records and seeking an expert.

Because there was reasonable basis when CHC-C represented Ms. Chuisano, the September 20, 2012 decision awarded Ms. Chuisano reasonable compensation for CHC-C's work. While most of the requested fees and costs were reasonable, the September 20, 2012 decision reduced fees by $7,140 and costs by $950.

On the other hand, the September 20, 2012 decision interpreted Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994), as permitting a special master to find that reasonable basis may be lost. Given this holding, the September 20, 2012 decision found that reasonable basis ceased to exist after Dr. Shoenfeld refrained from giving a favorable opinion. Once reasonable basis was lost, Ms. Chuisano was no longer eligible for an award of attorneys' fees. Consequently, Ms. Chuisano was not awarded any amount of attorneys' fees for Mr. Moxley's work. Slip. op. at 17-21.

On October 11, 2012, Ms. Chuisano, whom Mr. Moxley still represented, filed a motion for reconsideration. She requested that: (1) the September 20, 2012 decision be vacated; and (2) the special master issue a new decision, awarding compensation for Mr. Moxley's work. The primary argument was that the reasonable basis, which the September 20, 2012 decision had found for the earlier phase of the case, persisted. An October 15, 2012 order granted Ms. Chuisano's

motion in part, by withdrawing the September 20, 2012 decision.[15] The October 15, 2012 order deferred re-examination of the substantive issues until the parties filed additional briefs.

The Secretary's response contained two parts. First, the Secretary argued that the special master was correct in finding no reasonable basis when Mr. Moxley represented Ms. Chuisano. Second, the Secretary also argued that the special master erred in finding reasonable basis when CHC-C represented Ms. Chuisano. The Secretary argued the statute of limitations should not affect reasonable basis. Under the Secretary's proposed interpretation of reasonable basis, Ms. Chuisano never had a reasonable basis and, therefore, the special master could not award compensation for CHC-C's work.

Briefs were accepted from both Mr. Moxley and CHC-C. On behalf of Ms. Chuisano, Mr. Moxley argued that the language in Perreira on which the September 20, 2012 decision relied was dicta, and not controlling.

CHC-C made essentially three arguments. First, CHC-C argued the Secretary waived the right to contest CHC-C's fees because the Secretary had not filed a motion for reconsideration. Second, CHC-C said it was reasonable for the law firm to investigate Ms. Chuisano's claim. Third, CHC-C challenged the reductions to its fees and costs made in the September 20, 2012 decision. The Secretary addressed CHC-C's argument that she had waived her arguments in a brief filed on January 25, 2013.

At that time, the Supreme Court was considering a case involving the availability of attorneys' fees in the Vaccine Program, Sebellius v. Cloer. Consequently, adjudication of the attorneys' fees application was deferred until after the Supreme Court issued its decision, which it did on May 20, 2013. 133 S.Ct. 1886 (2013), aff'g Cloer v. Sec'y Health & Human Servs., 675 F.3d 1358 (Fed. Cir. 2012) (en banc).

---

[15] Because the September 20, 2012 decision was withdrawn, neither party could file a motion for review. See Vaccine Rule 10(e) (discussing motions for reconsideration).

The parties (and CHC-C) were given an opportunity to file briefs regarding Cloer. Mr. Moxley filed a brief and the Secretary filed a brief. With those submissions, the application for attorneys' fees is again ready for adjudication.

## ANALYSIS

## Scope of Reconsideration

The preliminary question is what issues can be reconsidered? After the October 15, 2012 order granted Mr. Moxley's motion for reconsideration with respect to Mr. Moxley's fees, may the Secretary challenge the fees awarded to CHC-C?

Under the particular rules of the Vaccine Program, the answer is yes. As argued in the Secretary's January 25, 2012 reply, Vaccine Rule 10(e) states: "[t]he decision, once withdrawn, becomes void for all purposes and the special master must subsequently enter a superseding decision."

As a consequence of the withdrawal, it is as if the September 20, 2012 decision never issued. Because the original December 16, 2011 fee application remains unadjudicated, all questions remain open. Consequently, this decision must resolve whether the claim in Ms. Chuisano's petition was supported by reasonable basis at any time. The analysis of this question begins by reviewing the relevant statutory provisions, followed by a discussion of the meaning of "reasonable basis." Thereafter, the application from CHC-C and the application from Mr. Moxley are considered separately.

## Meaning of Reasonable Basis

### I.    Statutory Scheme for Filing Petitions and Recovering Attorneys' Fees

Congress created the Vaccine Program with at least two provisions that make the Vaccine Program different from traditional litigation. At the beginning of the case, when petitioners file their petition, they are required to submit evidence supporting their claim for compensation. At the end of the case, petitioners who have not received compensation remain eligible for an award of attorneys' fees and costs.

The Secretary's arguments against Ms. Chuisano's eligibility for attorneys' fees and costs involve both the provisions regarding the filing of petitions and the

14

meaning of the term "reasonable basis."  It is the Secretary's argument that "no reasonable basis existed for the filing or maintaining of the petition in this case." Resp't Opp'n, filed Feb. 17, 2012, at 3.  For this reason, the analysis begins with a review of what the statute says about filing petitions.

## A.    Filing Petitions

The process for filing a case in the Vaccine Program is unusual.  The Vaccine Act states:

> A petition for compensation under the Program for a vaccine-related injury or death shall contain (1) except as provided in paragraph (3), an affidavit, and supporting documentation demonstrating [five elements, which are discussed below].

42 U.S.C. § 300aa—11(c).  The next paragraph further specifies that the petition shall contain "vaccination records associated with the vaccine allegedly causing the injury, pre- and post-injury physician or clinic records."  Section 11(c)(2). Paragraph (3) of section 11(c) permits the petitioner to submit a statement identifying those records that were "described in paragraph (1) or (2) which are unavailable to the petitioner and the reasons for their unavailability."[16]

---

[16]  The Court of Federal Claims has further defined these requirements. Vaccine Rule 2 provides, in relevant part:

(c)    **Contents of a Petition**
    (1)    *The Petition*.  The petition must set forth:
        (A)    a short and plain statement of the grounds for an award of compensation, including:
* * *
    (2)    *Required Attachments*.  As required by 42 U.S.C. § 300aa—11(c), the petition must be accompanied by the following documents:
        (A)    *Medical Records*.  The petitioner must include all available medical records supporting the allegations in the petition, including physician and hospital records relating to:
* * *
        (ii)    the injury, or death, . . .

(…continued)

15

By its express terms, section 11(c) requires "supporting documentation" (paragraph 1) and "records" (paragraph 2). The statute uses the term "shall," which is usually interpreted as a mandatory provision. See Hellebrand v. Sec'y of Health & Human Servs., 999 F.3d 1565, 1570 (Fed. Cir. 1993) (distinguishing "shall" from "may"). This requirement is made more emphatic in paragraph 3 in which Congress stated that when those records were not available, the petitioner needed to submit a statement, explaining why those documents were not available.[17]

In addition to stating that the petition shall contain documentary evidence, the statute indicates what those documents should contain. Section 11(c) states that the petition "shall contain . . . supporting documentation demonstrating" various elements. To understand what the phrase "supporting documentation demonstrating" means, consulting a dictionary is permitted. See Hervey v. Sec'y of Health & Human Servs., 88 F.3d 1001, 1002 (Fed. Cir. 1996) (using dictionary to define a term in the Vaccine Act). The root of the term "supporting," "support," means "to provide corroborating evidence for." The American Heritage Dictionary p. 1222 (2d College ed. 1985). The term "demonstrating" means "to prove or make evident by reasoning or adducing evidence." Id. at 380. Thus, in the statutory scheme designed by Congress, the petition shall contain documents providing evidence for the claim made in the petition.

---

           (iii)    any post-vaccination treatment of the injured person, including all in-patient and out-patient records, provider notes, test results, and medication records;

   (B)   *Affidavits*.

          (i)    If the required medical records are not submitted, the petitioner must include an affidavit detailing the efforts made to obtain such records and the reason for their unavailability.

[17] By this exception, Congress acknowledged that petitions could be supplemented with medical records. See Stewart v. Sec'y of Health & Human Servs., No. 02-819V, 2002 WL 31965743, at *6 (Fed. Cl. Spec. Mstr. Dec. 30, 2002).

16

Section 11(c)(1), in turn, is referenced in the section that defines when a petitioner is entitled to compensation. That provision states that the petitioner is awarded compensation when, in relevant part, "the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa-11(c)(1) of this title." 42 U.S.C. § 300aa—13(a)(1); accord Massing v. Sec'y of Health & Human Servs., 926 F.2d 1133, 1135 (Fed. Cir. 1991) ("Section 13(a)(1)(A) requires that petitioners prove the matters set forth in § 11(c)(1) by a preponderance of the evidence").

As mentioned previously, there are five "matters required" in section 11(c)(1). These correspond to paragraphs (A) through (E). To be entitled to compensation, petitioner must establish all these elements by a preponderance of the evidence. 42 U.S.C. § 300aa—13(a)(1).

Of those five elements, the most commonly contested element is (C), which concerns causation. The statute creates two methods of establishing causation. The first is to show that the person suffered an injury listed on the Vaccine Injury Table. With the Vaccine Injury Table, causation is presumed and the person is entitled to compensation unless the Secretary shows something else caused the injury. Shalala v. Whitecotton, 514 U.S. 268, 270-71 (1995). The second route, which is the one taken by Ms. Chuisano, is for injuries not listed on the Vaccine Injury Table. For those cases, the petitioner must show that a vaccine caused the injury. Section 11(c)(1)(C)(ii)(I). These are often called "causation-in-fact" cases. See Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1321 (Fed. Cir. 2010); Capizzano v. Sec'y of Health & Human Servs., 440 F.3d 1317, 1324 (Fed. Cir. 2006).

By the time Ms. Chuisano filed her petition in 2007, the elements of a causation-in-fact case were established. The Federal Circuit summarized those elements in Althen v. Sec'y of Health & Human Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

Althen also discussed what type of evidence petitioners could use to establish those elements. To be entitled to compensation, petitioners need to substantiate their claim with "medical records or medical opinion." (emphasis in original). Id. at 1279 (citing section 13(a)(1)). "Medical records" and "medical opinion" stand in contrast to opinions expressed by a petitioner. A petitioner's own statement is not a sufficient basis to award compensation. 42 U.S.C. § 300aa—13(a)(1) (a special master may not award compensation "based

17

on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion").

In sum, with respect to the initial filing, the Vaccine Act is fairly demanding. Unlike a system in which pleadings are adequate when they provide fair notice, a petition in the Vaccine Act "shall contain . . . supporting documentation." Congress's requirement for a comprehensive petition is the foundation for much of the Vaccine Program. For example, Congress expected that special masters would decide a case within 240 days of its filing. See 42 U.S.C. § 300aa—12(d)(3)(A). This expeditious case processing, to which appellate authorities refer, see Whitecotton, 514 U.S. at 269; Widdoss v. Sec'y of Health & Human Servs., 989 F.2d 1170, 1172 (Fed. Cir. 1993) (discussing legislative history), cannot occur when petitioners do not present a comprehensive case initially.

As discussed below, there is not any serious dispute that Ms. Chuisano failed to present documents supporting a claim that the flu vaccine contributed to her mother's death. The more contentious issue is whether Ms. Chuisano can, nevertheless, satisfy the standard for awarding a non-prevailing petitioner attorneys' fees. The criteria for being awarded attorneys' fees are discussed next.

## B. Statutory Basis for Awarding Attorneys' Fees in the Vaccine Program

Under the "American rule," each litigant pays the fees of his (or her) attorney. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975). Congress, in some contexts, has altered this rule by allocating the costs of litigation differently. Most fee-shifting statutes authorize awards to a "prevailing party" and do not authorize awards to those parties that do not prevail. Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 603 (2001). Effectively, for most fee-shifting statutes, there are two groups of litigants: prevailing parties and non-prevailing parties.

Eligibility for attorneys' fees pursuant to the Vaccine Act is different, or, in the words of the Supreme Court, "unusual." Cloer, 133 S.Ct. at 1891. The relevant statutory provision, 42 U.S.C. § 300aa—15(e), creates three classes. [18]

---

[18] The statute provides:

(…continued)

The first class is the group of petitioners who are prevailing parties in that they are awarded compensation. For these successful petitioners, an award of reasonable attorneys' fees is mandatory. The second class is the group of petitioners who are not awarded compensation but, nonetheless, acted in good faith in bringing their petition and had a reasonable basis for the claim for which they brought their petition. For these unsuccessful petitioners, an award of attorneys' fees is discretionary. The final class of petitioners is the group of petitioners who are not awarded compensation and who cannot demonstrate that their claims were filed in good faith and with a reasonable basis. See Austin v. Sec'y of Health & Human Servs., No. 10-362V, 2013 WL 659574, at *7 (Fed. Cl. Spec. Mstr. Jan. 31, 2013) (recognizing three groups of petitioners).

Congress's creation of a class of petitioners who are eligible for attorneys' fees when they have not received compensation makes more petitioners eligible for awards of attorneys' fees. This expansion reflects a Congressional intent "to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims."[19] Cloer, 675 F.3d at 1362 (quoting Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1352 (Fed. Cir. 2008)).

---

> In awarding compensation on a petition . . . the special master or court shall also award as part of such compensation an amount to cover ---
>     (A) reasonable attorneys' fees, and
>     (B) other costs,
> incurred in any proceeding on such petition. If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

[19] Special masters have implemented Congress's goal of paying attorneys by always awarding attorneys' fees upon a finding of reasonable basis. Although special masters have discretion not to award attorneys' fees to unsuccessful petitioners whose cases are supported by a reasonable basis, special masters have not exercised this discretion to deny attorneys' fees for cases supported by a reasonable basis.

19

Despite the goal of promoting attorney participation in the Vaccine Program, Congress did not authorize awards of attorneys' fees to all unsuccessful petitioners. Cf. American Exp. Co. v. Italian Colors Restaurant, 133 S.Ct. 2304, 2309 (2013) (stating "[n]o legislation pursues its purposes at all costs"); F.T.C. v. Actavis, Inc., 133 S.Ct. 2223, 2242 (2013) (Roberts, C.J., dissenting) (stating "it should by now be trite --- and unnecessary --- to say that 'no legislation pursues its purposes at all costs' and that 'it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law'") (emphasis in original). For unsuccessful petitioners, Congress extended attorneys' fees only to those whose cases were supported by reasonable basis and good faith. This specific limitation necessarily implies that there are some unsuccessful petitioners whose cases are not supported by reasonable basis (and therefore not eligible for attorneys' fees). See Slattery v. United States, 635 F.3d 1298, 1323 (Fed. Cir. 2011) (en banc) (discussing the canon of statutory construction expressio unius est exclusion alterius). As the Federal Circuit explained, "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an expert state an unsupported opinion." Perreira, 33 F.3d at 1377.

The question becomes how to distinguish between the second group of petitioners (those whose unsuccessful claims are supported by a reasonable basis) and the third group of petitioners (those whose unsuccessful claims lack reasonable basis). The distinction depends upon a finding of reasonable basis (or the lack thereof).

### C. Reasonable Basis

The Vaccine Act does not define "reasonable basis" explicitly. Furthermore, "[n]either the Federal Circuit nor [the Court of Federal Claims] has had occasion to define the meaning of 'reasonable basis' for purposes of fee awards under the Vaccine Act." Woods v. Sec'y of Health & Human Servs., 105 Fed. Cl. 148, 153 (2012).[20]

---

[20] There is a similar absence of guidance from the Federal Circuit and from the Court of Federal Claims in the form of a rule governing proceedings in the Vaccine Program. The only Federal Circuit case to consider a special master's evaluation of whether reasonable basis supported a claim that a vaccine caused an

(…continued)

Without instructions from either the Federal Circuit or the Court of Federal Claims, the remaining precedents are the decisions of special masters. Collectively, special masters have not been entirely consistent.[21] Rather than

---

injury is <u>Perreira</u>, 33 F.3d 1375. <u>Perreira</u>, however, did not set a minimum qualification for reasonable basis or otherwise define the term.

[21] For a lengthy history of how reasonable basis has been treated, see <u>Silva v. Sec'y of Health & Human Servs.</u>, No. 10-101V, 2012 WL 2890452, at *9-12 (Fed. Cl. Spec. Mstr. June 22, 2012), <u>motion for review denied</u>, 108 Fed. Cl. 401 (2012). Regardless of the consistency or lack thereof, special masters do not bind other special masters. <u>Hanlon v. Sec'y of Health & Human Servs.</u>, 40 Fed. Cl. 625, 630 (1998), <u>aff'd</u>, 191 F.3d 1344 (Fed. Cir. 1999).

The Secretary has also acted inconsistently. In some cases in which the petitioner has presented relatively little evidence supporting the claim for which the petition was brought, the Secretary did not argue against an award of attorneys' fees. <u>See</u>, <u>e.g.</u>, <u>Browning v. Sec'y of Health & Human Servs.</u>, No. 02-929, 2010 WL 3943556, at *1, *4 (Fed. Cl. Spec. Mstr. Sept. 27, 2010) (finding that the petitioner's claim lacked a reasonable basis after a certain point in the proceedings despite the fact that the Secretary did not oppose the petitioner's application for attorneys' fees and costs); <u>cf.</u> <u>Savin v. Sec'y of Health & Human Servs.</u>, 85 Fed. Cl. 313, 319 (2008) (holding that "this court cannot subscribe to the notion that, because respondent failed to object to certain items, the Special Master was compelled . . . to find [the petitioners'] requests were reasonable, despite obvious indications to the contrary"). However, the Secretary's position in those cases does not estop the Secretary from arguing that the impending expiration of the statute of limitations should not affect the analysis of reasonable basis. <u>New Hampshire v. Maine</u>, 532 U.S. 742, 755 (2001) (acknowledging that "broad interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests") (quoting 18 Wright § 4477, p. 784); <u>see also</u> <u>Heckler v. Cmty. Health Servs. of Crawford City., Inc.</u>, 467 U.S. 51, 60 (1984) ("[I]t is well settled that the Government may not be estopped on the same terms as any other litigant.").

Some of the inconsistency appears to have arisen in cases filed pursuant to the Omnibus Autism Proceeding. For various reasons, the parties and the special masters presiding over the cases in the OAP agreed to different procedures to expedite the processing of more than five thousand cases. The process in the OAP appears to differ from the process used in this case.

(…continued)

attempt to fit Ms. Chuisano's case into a particular pattern, this decision starts afresh to address the arguments, particularly the Secretary's arguments, made in this case.

Reasonable basis is a standard that petitioners meet by submitting evidence. The focus on evidence is consistent with the statutory scheme in which Congress stated a "petition . . . shall contain – (1) . . . supporting documentation" (section 11(c)), and Congress directed special masters, when determining whether to award compensation to consider "the record as a whole" (section 13(a)(1)). Evaluation of evidence seems inherent in the function of special masters as judicial officers. Cf. Althen, 418 F.3d at 1281 (stating "[t]he special master's role is to assist courts by judging the merits of individual claims on a case-by-case basis"). If special masters did not make decisions about reasonable basis based upon evidence, how would special masters decide? And how would appellate courts review the special master's decision when they must do so?

Although the statement that reasonable basis requires evidence may not be controversial, this statement carries consequences about the method for determining whether there was reasonable basis for the claim for which the petition was brought. At the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis because the petitioner could not meet the burden of proof needed to establish reasonable basis. See Turpin v. Sec'y of Health & Human Servs., No. 99–564V, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted only one affidavit and no other records); Brown v. Sec'y of Health & Human Servs., No. 99–593V, 2005 WL 1026713, at *2 (Fed. Cl. Spec. Mstr. March 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). As the Court of Federal Claims has explained, a "petitioner must affirmatively establish a reasonable basis to recover attorneys' fees and costs." McKellar v. Sec'y of Health & Human Servs., 101 Fed. Cl. 297, 304 (2011), remanded to No. 09-841V, 2012 WL 362030 (Fed. Cl. Spec. Mstr. Jan. 13, 2012), rev'd without prejudice, 2012 WL 1884703 (Fed. Cl. May 3, 2012).

If reasonable basis requires evidence, the next question is how much evidence is sufficient? The Vaccine Act does not say, although the Vaccine Act hints at the meaning. For questions as to whether the petitioner is entitled to

compensation, the Vaccine Act specifies that petitioners' burden is "a preponderance of the evidence." 42 U.S.C. § 300aa—13(a)(1). When a petitioner meets the preponderance of the evidence standard, the petitioner is entitled to compensation, and when the petitioner is entitled to compensation, that compensation "shall" include reasonable attorneys' fees. 42 U.S.C. § 300a—15(e)(1).

In addition to mandating an award of attorneys' fees when the petitioner is entitled to compensation (which is another way of saying that a preponderance of evidence supports petitioner's claim), section 15 states a "special master . . . may award" attorneys' fees under a different circumstance. This alternative circumstance is "good faith and reasonable basis." Because reasonable basis is an alternative way to become eligible for attorneys' fees, reasonable basis to support a claim cannot be based upon the same (preponderance of the evidence) standard. See Walton v. United States, 551 F.3d 1367, 1370 (Fed. Cir. 2009) ("When Congress uses different parallel words in the alternative in the same statutory provision, it is reasonable to assume that the words have different meanings."). Thus, "reasonable basis" as contemplated in the Vaccine Act must require an evidentiary showing of something less than a preponderance of the evidence.

What is this evidentiary standard? It is difficult to answer because the common law does not set the burden of persuasion lower than a preponderance.[22] When Congress has not defined an evidentiary threshold, the judiciary may fill this gap. Steadman v. Securities Exchange Comm'n, 450 U.S. 91, 95 (1981) (interpreting Administrative Procedure Act).

In the absence of a Federal Circuit instruction, it may be easier to define reasonable basis in terms of what it is not.[23] Reasonable basis requires presenting

---

[22] Two other frequently used evidentiary standards, clear and convincing as well as beyond a reasonable doubt, are more demanding than the preponderance of the evidence standard.

[23] One possible evidentiary standard is the "substantial evidence" test. The Federal Circuit uses the substantial evidence test to determine whether a fact-finder's factual determinations should be upheld. See, e.g., In re Gartside, 203 F.3d 1305, 1315 (Fed. Cir. 2000)

Although a standard typically used in appellate review may seem to be an awkward fit as the standard for a special master to use in determining reasonable

(…continued)

23

more than evidence showing only that the vaccine preceded the onset of the injury for which the petitioner seeks compensation.

While timing is needed, timing alone is not sufficient to establish reasonable basis for two reasons.  First, as a matter of law and logic, a sequence of events does not establish causation.  An assertion that a vaccine caused an injury because the vaccine preceded the injury is an example of the logical fallacy known as "post hoc ergo propter hoc."  The Federal Circuit incorporated this principle into Vaccine Program jurisprudence when it declared, more than 20 years ago, that "'[t]he inoculation is not the cause of every event'" that follows it.  Grant v. Sec'y of Health & Human Servs., 956 F.2d 1144 (Fed. Cir. 1992) (quoting Hasler v. United States, 718 F.2d 202, 205 (6th Cir. 1983)).

Second, if timing alone were adequate, then the Congressional scheme would be frustrated.  Congress did not guarantee payment of reasonable attorneys' fees in all unsuccessful cases.  By making eligibility for fees conditional upon a finding of reasonable basis, Congress must have expected that some unsuccessful cases would not be awarded attorneys' fees.  If presenting evidence showing a temporal sequence in which a vaccine preceded an injury were enough to move cases from the third category (unsuccessful and no reasonable basis) to the second category (unsuccessful but supported by reasonable basis), then the third category practically would be rendered a nullity.  It would be a very rare case in which the sequence between vaccine and injury were backwards.[24]

basis in the first instance, the unusual circumstances in which Congress has authorized an award of attorneys' fees to a non-prevailing party may justify resorting to the substantial evidence standard.  Whether the substantial evidence standard (or some other measure) accurately reflects Congress's intent is for an appellate court.  See Althen, 418 F.3d at 1280 (stating "[t]he special master's role is to apply the law.").

[24] Occasionally, a petitioner may have a subclinical disease (like multiple sclerosis) and develop overt manifestations after vaccination.  See W.C. v. Sec'y of Health & Human Servs., No. 07-456, 2011 WL 4537877 (Fed. Cl. Spec. Mstr. Feb. 22, 2011), mot. for rev. denied in relevant part, 100 Fed. Cl. 440 (2011), aff'd, 704 F.3d 1352 (Fed. Cir. 2013).  The petitioner's absence of symptoms before vaccine may give the petitioner a reasonable belief that the vaccine caused the symptoms (and, therefore, the disease) that arose after the vaccine.

24

For these reasons, evidence showing a sequence in which vaccination precedes injury is one step toward satisfying the reasonable basis standard. But, simple evidence of temporality, by itself, is not enough. Whether CHC-C believes that a basic chronology of events in which the vaccination preceded the onset of a disease qualifies as reasonable basis is not known because CHC-C has not proposed any interpretation of reasonable basis.[25]

Consistent with her earlier briefing, the Secretary maintains "[t]o have a 'reasonable basis,' petitioner's vaccine injury claim must, at a minimum, be supported either by the medical records submitted with the petition or by a medical opinion. 42 U.S.C. §300aa-13(a)(1)." Resp't Resp., filed December 12, 2012, at 4. According to the Secretary, "it is insufficient for the Special Master to find simply that Ms. Chuisano's case possessed a reasonable basis because her attorneys acted reasonably in filing the claim to avoid the expiration of the Act's statute of limitations." Id. The remainder of the Secretary's response develops the argument that the statute of limitations does not affect the reasonable basis analysis.

The Secretary's arguments are persuasive for four reasons. First, there is the language of the statute. See Cloer, 654 F.3d at 1330 ("Our analysis must begin with the plain language of the statute."). Congress required an unsuccessful

---

[25] The lack of assistance from CHC-C about the meaning of reasonable basis continues a distressing pattern. The Secretary's response to the initial fee application argued that Ms. Chuisano never established reasonable basis. Resp't Opp'n, filed Feb. 12, 2012, at 4-10. CHC-C's reply provided no argument about the meaning of reasonable basis. See exhibit 15. The withdrawn September 20, 2012 Fees Decision observed: "[i]n her briefs, Ms. Chuisano does not furnish an interpretation of "reasonable basis," although her application for attorneys' fees and costs is premised upon her meeting that criterion." Slip op. at 11. This statement should have alerted CHC-C that the law firm should set forth its views.

When the Secretary responded to Mr. Moxley's motion for reconsideration, the Secretary focused most of her arguments on the perceived error in finding that Ms. Chuisano's cases had a reasonable basis. Resp't Resp. , filed Dec. 17, 2012, at 3-7. CHC-C was permitted to respond. However, CHC-C did not directly address the Secretary's argument that the statute of limitations should not affect the determination of whether reasonable basis supported the claim for which Ms. Chuisano filed her petition. See CHC-C Reply, filed January 11, 2013.

petitioner to establish "a reasonable basis for the claim for which the petition was brought." 42 U.S.C. 300aa-§ 15(e)(1). The mention of "the petition" encompasses the supporting documentation described in section 11. See Cloer, 133 S.Ct. at 1894 (rejecting the Secretary's interpretation of the statute due to a lack of cross-reference between two sections of the Vaccine Act) (quoting Bates v. United States, 522 U.S. 23, 29-30 (1997)) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts independently and purposefully in the disparate inclusion or exclusion.") (internal quotations omitted). Thus, reasonable basis is linked to "the claim" contained in the petition, not the petition itself.[26]

Second, for the reasons explained above, petitioners meet their burden by presenting evidence. To be relevant to the reasonable basis analysis, the evidence must support "the claim for which the petition was brought." The procedural history of a case, including information about when a case was filed, is typically not evidence relating to whether a vaccine caused any harm. For example, the fact that CHC-C filed Ms. Chuisano's petition on June 28, 2007, did not affect the outcome of whether Ms. Chuisano received compensation. The case was dismissed because Ms. Chuisano did not meet her burden of proof. Assuming the same evidentiary record, this outcome would have been the same if CHC-C had filed the petition one year earlier. The case of a petitioner rises or falls on the strength or weakness of evidence. CHC-C has not shown why the same method of analyzing evidence should not determine whether the attorney is compensable.

Third, consideration of the statute of limitations ultimately may result in disparate treatment. More than five years ago, a special master identified a tension between, on the one hand, compensating attorneys who file petitions shortly before the expiration of the statute of limitations without adequately investigating the assertions contained in the petition, and, on the other hand, requiring attorneys to obtain adequate support for the claims in the petition. See Lamar v. Sec'y of Health & Human Servs., No. 99-583V, 2008 WL 3845165, at *4 n.13 (Fed. Cl. Spec. Mstr. July 30, 2008) (stating "our cases interpreting the good faith and reasonable basis requirements leniently encourage 'gaming the system' by failing to require counsel to adequately investigate and substantiate the petition at the

---

[26] Conceivably, Congress could have said "a reasonable basis for filing the petition." That formulation connects reasonable basis to filing. But, Congress did not use that language to express its intent.

outset"). The Secretary's brief explains how attorneys may fare differently, depending on whether they abide by the statutory requirement to submit petitions with "supporting documentation":

> A policy of promoting payment to those attorneys who file claims without a reasonable basis because the [statute of limitations] prevented a thorough pre-filing investigation, ultimately treats similarly situated claimants unequally. In other cases, if, after doing the required pre-filing analysis, a petitioner's counsel concludes his client's case lacks a reasonable basis, it is clear that he cannot proceed to file the petition in order to recover Program funds for his time and expense in performing the initial investigation. This loss of time, real as it may be, is the "cost of doing business."
> If Congress did not intend to compensate attorneys for meritless claims, the same result should hold true for all cases that lack a reasonable basis, including those where the bulk of petitioner's counsel's investigation and claim analysis occurs after the filing of the petition.

Resp't Resp. at 6-7. CHC-C did not address this argument. The lack of response from CHC-C is particularly unfortunate because the Federal Circuit has emphasized the need to treat petitioners equally. Figueroa v. Sec'y of Health & Human Servs., 715 F.3d 1314, 1317-18 (Fed. Cir. 2013) (citing Cloer, 654 F.3d at 1340).

Fourth, changing the reasonable basis standard simply because a petitioner filed close to the statute of limitations is tantamount to giving that petitioner a presumption that reasonable basis exists. See Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). However, the Court of Federal Claims has stated "there is no presumption of a petitioner's reasonable basis." McKellar, 101 Fed. Cl. at 304.

All these reasons support the Secretary's argument that the method for determining whether petitioners have met their burden regarding reasonable basis should not include consideration of the statute of limitations. As mentioned previously, CHC-C did not offer any reasons why the statute of limitations should matter.

Possibly, CHC-C could have raised two (overlapping) arguments based in policy. First, CHC-C could have maintained that special masters have adopted a policy of compensating attorneys who are compelled to file petitions shortly before the expiration of the statute of limitations. Examples of cases following this policy include McNett v. Sec'y of Health & Human Servs., No. 99-684V, 2011 WL 760314, at *8 (Fed. Cl. Spec. Mstr. Feb. 4, 2011), and Hamrick, 2007 WL 4793152, at *5 (giving petitioners' attorneys "the benefit of the doubt when they file[d] a petition just before the statute of limitations expire[d]").

However, decisions of special masters have precedential force only to the extent that those decisions contain persuasive reasoning. See Hanlon, 40 Fed. Cl. at 630; cf. Graves v. Sec'y of Health & Human Servs., 109 Fed. Cl. 579, 590, 596 (2013) (setting aside the long-standing policy of special masters when the policy was not in accord with the statute). The problem with Hamrick is that the decision contains relatively little analysis. Although Hamrick stated that reasonable basis was evaluated based upon the "totality of the circumstances," the support for that proposition came from cases interpreting the Equal Access to Justice Act. After Hamrick, the Court of Federal Claims has rejected importing Federal Circuit interpretations of EAJA to the Vaccine Program. Masias v. Sec'y of Health & Human Servs., 106 Fed. Cl. 700, 704 (2012); Morse v. Sec'y of Health & Human Servs., 93 Fed. Cl. 780, 785 (2010). A specific analysis of the text of the Vaccine Act indicates that the evaluation of reasonable basis should depend on the presence of evidence constituting "supporting documentation" for the claim set forth in the petition.

The second policy-based argument that CHC-C could have made (but did not make) is that CHC-C should be compensated for its reasonable efforts in representing Ms. Chuisano simply to encourage attorneys to represent petitioners, who would otherwise appear pro se. The Federal Circuit cited this policy when it held petitioners may reject a judgment denying them compensation but still accept judgment awarding attorneys' fees. Saunders v. Sec'y of Health & Human Servs., 25 F.3d 1031, 1035-36 (Fed. Cir. 1994). And the recent en banc decision that permitted special masters to award attorneys' fees to petitioners whose cases were barred by the statute of limitations cited that policy. Cloer, 654 F.3d 1322.

Evaluating these hypothetical policy-based arguments is unnecessary because neither CHC-C nor Mr. Moxley has raised them on behalf of Ms. Chuisano. See Vaccine Rule 8(f). Moreover, these arguments must yield when the statutory language is clear, as it here. See Cloer, 133 S.Ct. at 1895-96. Section 15(e) links "reasonable basis" to the "petition" and section 11(c) links the

28

"petition" to documentation and affidavits. Cloer, 133 S.Ct. at 1896 ("Special masters consistently make fee determinations on the basis of the extensive documentation required by § 300aa-11(c) and included with the petition"). Ms. Chuisano has not offered any argument based on the text of the statute to create a different standard for reasonable basis when the statute of limitations may bar the action. While Congress might have enacted a statute creating special standards for attorneys who did not obtain the "supporting documentation" (section 11(c)) before they filed the petition, Congress did not. Special masters should not add to the statutory scheme. Beck v. Sec'y of Health & Human Servs., 924 F.2d 1029, 1034 (Fed. Cir. 1991) ("[r]egardless of their merits, these policy arguments may be implemented only by Congress. Our duty is limited to interpreting the statute as it was enacted, not as it arguably should have been enacted").

This decision's focus on evidence supporting a finding of reasonable basis is different from the treatment in other cases, partly because the Secretary has argued more persuasively here. In addition, the outcome is in accord with some of the relatively few opinions from the Court of Federal Claims addressing reasonable basis. See, e.g., Silva v. Sec'y of Health & Human Servs., 108 Fed. Cl. 401, 405 (2012) (finding the special master did not abuse his discretion in finding no reasonable basis when petitioner could not establish that she suffered the injury she claimed and petitioner's investigation of the case before filing the petition was inadequate); Woods, 105 Fed. Cl. at 152 (finding that the special master erred when special master "cited no allegations of injury or causation, no medical records, and no legal authority in determining that Petitioners' claim had a reasonable basis"); Murphy v. Sec'y of Health & Human Servs., 30 Fed. Cl. 60, 62 (1993) (finding special master's decision that petitioners did not have a reasonable basis was not arbitrary and stating "an attorney should use reasoned judgment in determining whether to accept and pursue a claim"), aff'd, 48 F.3d 1236 (Fed. Cir. 1995) (table). Although none of these cases addresses whether the statute of limitations affects reasonable basis, they, nonetheless, touch on relevant aspects. For example, Woods emphasizes the need for evidence to support the finding of reasonable basis. Silva and Murphy point to the need for petitioners' attorneys to investigate the case before filing a petition.

For all these reasons, the inquiry into whether reasonable basis supported the claim in the petition depends upon the evidence submitted. The following section analyzes the evidence submitted to determine whether the evidence justifies a finding of reasonable basis.

## II. Whether Ms. Chuisano Had Reasonable Basis "for the Claim for which the Petition was Brought"

From this analysis about the meaning of reasonable basis, the ensuing question is does evidence support a finding that Ms. Chuisano met her burden? It is important to remember that the claim for which Ms. Chuisano sought compensation was that the flu vaccine caused or contributed to the death of her mother, Ms. D'Esposito.

It is true that Ms. D'Esposito received the flu vaccine on October 12, 2004, and she died on December 24, 2004. Exhibit 4 at 17 (vaccination); exhibit 3 at 1 (death certificate listing her cause of death as adult respiratory distress syndrome due to pneumococcal pneumonia and sepsis). This sequence shows the vaccination preceded the death. But, is there any evidence causally connecting the two events?

CHC-C cites to no evidence supporting a causal connection between the flu vaccine and Ms. D'Esposito's death. The only portion of their brief in which CHC-C cites to evidence in the context of discussing the flu vaccination and Ms. D'Esposito's death is: "the following facts are indisputable: On October 12, 2004, Frances received a flu vaccine; shortly thereafter, she had a reaction to this vaccine, as is clearly documented in her medical records."[7] CHC-C Reply, filed January 11, 2013, at 8 (footnote 6 omitted without notation and footnote 7 in the reply brief refers to three medical records discussed below).

The three medical records cited in footnote 7 do not support the statement that Ms. D'Esposito "had a reaction." Exhibit 1 at 6 is a nursing assessment that includes a section on allergies. Within this part, there are handwritten entries for "Biaxin, Z-Pack, Cefzil," but not any vaccine. Exhibit 1 at 13 is a continuation of the same nursing assessment. As part of the algorithm for determining whether Ms. D'Esposito should receive the flu vaccine, a note states she "had vac. last week." The other record, which is from the emergency department, states in two places that Ms. D'Esposito received "flu shot 2 days ago." Exhibit 1 at 718-19. CHC-C cites only these documents. If other documents linked Ms. D'Esposito's flu vaccination and the illnesses preceding her death, it was incumbent on CHC-C to cite them. See Simanski v. Sec'y of Health & Human Servs., 96 Fed. Cl. 588, 611 (2010), rev'd on other grounds and remanded, 671 F.3d 1368 (Fed. Cir. 2012). However, an independent review of Ms. D'Esposito's medical records has not identified any other instances in which doctors discuss Ms. D'Esposito's flu vaccination.

By now, it is well-established that statements in medical records showing a sequence of events are not statements showing causation. Cedillo v. Sec'y of Health & Human Servs., 617 F.3d 1328, 1347-48 (Fed. Cir. 2010); Caves v. Sec'y of Health & Human Servs., 100 Fed. Cl. 136-37 (2011), aff'd per curiam without opinion, 463 Fed. Appx. 932 (Fed. Cir. 2012).

Rather than citing evidence, CHC-C emphasizes the actions of its attorneys:

> "Debra Chuisano was first interviewed on March 8, 2005. She was asked to have a legal representative appointed for her mother's estate, and to send CHCC her mother's medical records." CHC-C Reply, at 5.

> "CHCC believed that Frances may have had a vaccine-compromised immune system, and, therefore, was unable to fight off an infection that led to her death." Id. at 7.

> "CHCC then, with the assistance of the special master, began the laborious chore of collecting Frances' medical records." Id.

> "CHCC sought the opinion of Dr. Yehuda Shoenfeld, an expert immunologist, who reviewed Frances' medical records and relevant scientific literature." Id. at 8.

> "[T]hough counsel ultimately did not link Frances' death with her vaccine, it was certainly reasonable and prudent to investigate a possible connection." Id.

> CHC-C "was required to request, obtain, file, review and summarize thousands of pages of Frances' medical records." Id. at 9.

> "Former counsel was also required to conduct scientific research, and to draft and file a petition, an affidavit, an amended petition, and various motions with the court. Counsel was required to prepare for, and

31

> participate in, status conferences with the special master and opposing counsel." Id.

> "[C]ounsel was required to adequately explore any and all theories relevant to her claim." Id. at 9-10.

These points reflect a fundamental difference in orientation about the meaning of reasonable basis. In pointing to their own activities, CHC-C implicitly equates the conduct of attorneys with a reasonable basis. However, for the reasons discussed at length above, the reasonable basis standard is an evidentiary standard. Thus, the description of the attorneys' activities is not relevant to the inquiry at hand.[27] What is relevant, and what CHC-C fails to identify, is evidence. The attorneys' beliefs and hopes about what evidence might be produced in the future are not evidence.

At the end of the day, the evidence shows that Ms. D'Esposito died because she was infected with pneumonia bacteria, probably developed sepsis, and had congestive heart failure. Exhibit 5 at 4 (discharge report). CHC-C received this information on December 21, 2006, approximately six months before the law firm filed the petition. Whether CHC-C appreciated the significance of the discharge report cannot be ascertained from the attorneys' time records. Regardless, CHC-C never presented any evidence rebutting the account presented in the discharge report. Ms. Chuisano did not present any evidence providing a basis to support her claim that the flu vaccine caused her mother's death. Consequently, she did not meet her burden for establishing, in the statute's words, "a reasonable basis for the claim for which the petition was brought." Therefore, she cannot be awarded attorneys' fees in any amount.[28]

---

[27] The reasonableness of the activities performed by the attorney is part of the lodestar formula to determine the amount of the attorneys' fees. Avera, 515 F.3d at 1347-48. Reasonable attorneys' efforts do not confer "reasonable basis" to a case that lacks an evidentiary basis.

[28] For the sake of judicial efficiency, CHC-C's challenges to the partial reduction in fees made in the withdrawn September 20, 2012 Fees Decision have been reviewed. See CHC-C Reply, filed January 11, 2013, at 10-13. CHC-C has not demonstrated that any of the anticipated reductions was unreasonable.

32

## III. Mr. Moxley's Motion for Reconsideration

The finding that Ms. Chuisano did not satisfy the reasonable basis standard resolves Mr. Moxley's motion for reconsideration. Since Ms. Chuisano did not have a reasonable basis, she may not be awarded any attorneys' fees at all. However, strictly for reasons of judicial efficiency, his arguments are addressed.

Mr. Moxley's argument has two steps. First, he maintains that he was not aware that the special master might find reasonable basis supported Ms. Chuisano's case for only part of the time. Second, Mr. Moxley argues that had he known this outcome were possible, he would have argued that reasonable basis should be determined only once. Since the withdrawn September 20, 2012 Fees Decision had found reasonable basis for CHC-C, the reasonable basis necessarily extended to cover Ms. Chuisano's case when he represented her. Mr. Moxley is wrong on both counts.

With respect to Mr. Moxley's argument that he was not aware that reasonable basis was disputed, a review of the Secretary's response to the original fee application demonstrates that the Secretary consistently opposed a finding of reasonable basis. In the very first paragraph, the Secretary argued "[a]ny award of fees and costs is inappropriate as the petition lacked a reasonable basis, as required by 42 U.S.C. § 300aa—15(e)(1)(B)." Resp't Opp'n, filed Feb. 17, 2012, at 1. The beginning of the Secretary's recitation of facts contains the statement "[b]ased on the information in the record, no reasonable basis existed for the filing or maintaining of the petition in this case." Id. at 3. Almost all of the Secretary's brief is devoted to arguing that Ms. Chuisano did not have a reasonable basis. See id. at 4-10. In this context, the Secretary made the following statement, which defeats Mr. Moxley's argument that he was not placed on notice: "[e]ven if this case had a reasonable basis at the time of filing, it clearly lacked a reasonable basis by the time Mr. Moxley took over the case." Id. at 7.

Mr. Moxley's motion for reconsideration, therefore, is really devoted to raising an argument that he could have made earlier but did not. Ordinarily, a motion for reconsideration should not be used to gain a second opportunity to argue what was already decided. Fillmore Equipment of Holland, Inc. v. United States, 105 Fed. Cl. 1, 9 (2012). A proper motion for reconsideration would be based upon one of three factors: an intervening change in law, the discovery of previously unavailable evidence, or the need to prevent a manifest injustice. Shapiro v. Sec'y of Health & Human Servs., 105 Fed. Cl. 353, 361 (2012), aff'd mem., 503 Fed. Appx. 952 (Fed. Cir. 2013). Here, Mr. Moxley's situation does

not fit either of the first two criteria. Thus, he could legitimately seek reconsideration only if the underlying decision was "manifestly unjust."

Mr. Moxley has not established that the withdrawn September 20, 2012 Fees Decision was manifestly unjust. Even if it is assumed that a looming expiration of the statute of limitations permits a special master to find a reasonable basis for filing an otherwise unsupported petition (as the withdrawn September 20, 2012 Fees Decision held), that holding is predicated upon a distinction between filing a petition and maintaining a petition. See Hamrick, 2007 WL 4793152, at *7.

Within the Vaccine Program, a petitioner may lose reasonable basis while the case is pending, as Perreira illustrates. There, the chief special master found that the petitioner had a reasonable basis initially, although the reasons for finding reasonable basis are not explicit. The chief special master awarded attorneys' fees for the beginning of the case. However, the chief special master found that the petitioner did not have a reasonable basis to proceed to a hearing because the petitioner's expert's opinion was speculative. The chief special master, therefore, did not award attorneys' fees for the attorney's work at the hearing. The Federal Circuit affirmed the special master's decision that there was not a reasonable basis for the hearing.[29] Perreira, 33 F.3d at 1375. The Federal Circuit stated: "when the reasonable basis that may have been sufficient to bring the claim ceases to exist, it cannot be said that the claim is maintained in good faith." Id. at 1377.

On its face, this statement defeats Mr. Moxley's argument that "the legal contention that [Ms. Chuisano's] case began with good faith and reasonable basis . . . and that this [good faith and reasonable basis] ended when the case was handed off to substitute counsel is contrary to law." Mr. Moxley's Motion for Reconsideration, filed Oct. 11, 2012, at 2. Mr. Moxley's argument is that the holding in Perreira is inconsistent with Cloer, 675 F.3d 1358, and Comm'r v. Jean, 496 U.S. 154 (1990). Id. at 3-4.

Except in the sense of raising an issue for a possible appeal, Mr. Moxley's argument is misdirected. Even if there were a conflict—and the conflict may be more perceived than real—the proper course for a special master is to note the conflict and suggest a possible en banc review. Strickland v. United States, 423

---

[29] The chief special master's decision finding reasonable basis for the earlier phase was not before the Federal Circuit.

F.3d 1335, 1338 n.3 (Fed. Cir. 2005).  Until the Federal Circuit revisits <u>Perreira</u>, that case's language and outcome remain binding on special masters.

Under the method of analysis endorsed by <u>Perreira</u>, a special master may find that a petitioner lacks a reasonable basis to continue a case and that is what the withdrawn September 20, 2012 Fees Decision found.  Again, if it is assumed that the pressing expiration of the statute of limitations conferred a reasonable basis on the claim for which Ms. Chuisano brought her petition, there is no reason to extend this presumption to a successor attorney.  By the time Mr. Moxley was consulted about the case, CHC-C had collected the relevant medical records and consulted three experts without receiving a helpful opinion on causation.  Furthermore, because the case was already pending, Mr. Moxley had the relative luxury of time to review the materials before committing to represent Ms. Chuisano.

To the extent that Mr. Moxley had medical records available for review and time to consider their significance before entering the litigation, Mr. Moxley is comparable to the petitioner's attorneys in <u>Silva</u>, who happened to be Ms. Chuisano's former attorneys.  Before they filed a petition, Ms. Silva's attorneys had information available to them that called into doubt Ms. Silva's claim that she suffered a demyelinating injury.  Without reviewing the available medical records, the attorneys filed a petition alleging that a vaccine caused her to suffer transverse myelitis.  After Ms. Silva was given a chance to establish, on a more-likely-than-not basis, that she suffered from this disease, she did not present any additional evidence.  Ms. Silva's case was dismissed for lack of proof.  When Ms. Silva requested attorneys' fees, the (undersigned) special master found that there was not a reasonable basis for Ms. Silva's claim that a vaccine caused her to suffer a demyelinating injury.  Thus, Ms. Silva was not awarded any attorneys' fees.  <u>Silva</u>, 2012 WL 2890452.  The Court of Federal Claims denied a motion for review, affirming the denial of all attorneys' fees.  <u>Silva</u>, 108 Fed. Cl. 401.

Mr. Moxley stands in roughly the same position as petitioner's counsel in <u>Silva</u>.  Information about Ms. D'Esposito's final illness was available to him. Before Ms. Chuisano consulted Mr. Moxley, the Secretary submitted her report pursuant to Vaccine Rule 4.[30]  The Rule 4 Report informed Mr. Moxley something

---

[30] If Mr. Moxley did not want to rely upon the Secretary's recitation of events, he could have relied upon the amended petition that CHC-C had drafted and filed.

that he, as an attorney experienced in the Vaccine Program, should have already known --- Ms. Chuisano could prevail only if an expert provided an opinion. Resp't Rep't, filed May 30, 2008, at 6-9; see also 42 U.S.C. § 300aa-13.

Actually, Mr. Moxley did relatively little investigation before he became counsel of record. He spent approximately three hours reviewing materials. His paralegal spent another two hours summarizing records. According to his time sheets, he did not consult an expert before becoming counsel of record. His first communications with Dr. Levin came after he became counsel of record. Exhibit 10.[31]

When Mr. Moxley decided to enter the litigation without conducting a thorough analysis of the case, he impliedly accepted a risk that he could produce evidence that supported the claim for which Ms. Chuisano brought her petition. CHC-C's inability to produce any evidence supporting Ms. Chuisano's claim that the flu vaccine contributed to her mother's death --- even after consulting three experts including Dr. Shoenfeld --- should have warned Mr. Moxley that evidentiary gap in Ms. Chuisano's case would not be filled easily. Despite some effort, Mr. Moxley never presented any evidence strengthening Ms. Chuisano's case.

Mr. Moxley complains that his activities should have been compensated because his work was reasonable.

---

[31] Mr. Moxley's motion for reconsideration weakly suggests that he may have consulted other experts, but did not present that information as a matter of "billing judgment." Mot., filed Oct. 11, 2012, at 7-8 n.7. This implication is not credited for three reasons. First, fee-seeking attorneys bear the burden of documenting their activities. See Savin, 85 Fed. Cl. 313, 316 (noting that the Vaccine Guidelines, which advise counsel to keep accurate and contemporaneous billing records, "reflect the accumulated wisdom of numerous decisions emphasizing that fee records must be specific") (citing Guidelines for Practice under the National Vaccine Injury Compensation Program, available at http://www.uscfc.uscourts.gov/). Second, Mr. Moxley does not explicitly state that he consulted experts. Third, the most common way for attorneys to show that they exercised billing judgment is to record the activity but not to charge for the activity.

> The proper inquiry is not into whether there was a good faith, reasonable basis for the undersigned to continue the pursuit of vaccine injury compensation for the death of Debra Chuisano's mother. The proper inquiry would be into whether [or] not it would be reasonable to bill for the time and effort that it took to wind down the case and *inter alia* preserve the civil remedies available.

Mot. at 3. Along the same lines, Mr. Moxley argues that "this court could not find, without being arbitrary and capricious, that it is unreasonable for counsel to participate in status conferences, or to generate court-ordered status reports." Id. at 7. The fact that Mr. Moxley was ordered to advance his client's case by doing tasks such as filing status reports about his efforts to locate an expert and is not being compensated for that work creates an arguably "unfair" situation.

Regardless of the assistance Mr. Moxley provided to Ms. Chuisano, the basis for awarding attorneys' fees is complying with the statute. Contrary to Mr. Moxley's argument, the Vaccine Act requires that the special master determine whether there was a "reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa-15(e)(1). This inquiry into reasonable basis occurs first. If a petitioner has met the burden of showing a reasonable basis, then the special master goes to the next step, which is examining the reasonableness of the attorneys' efforts.

It cannot be the case that a petitioner's attorney's (reasonable) work confers reasonable basis to the claim for which the petition was brought. If it were true that attorneys should be compensated for reasonable activities, like complying with orders, then this approach would effectively eliminate the "reasonable basis" portion from the statute. This interpretation would not be in accord with the basic canon of statutory interpretation that a "'statute is to be construed in a way which gives meaning and effect to all of its parts.'" Heinzelman v. Sec'y of Health & Human Servs., 681 F.3d 1374, 1377 (Fed. Cir. 2012) (quoting Saunders v. Sec'y of Health & Human Servs., 25 F.3d 1031, 1035 (Fed. Cir. 1994) (further citations omitted). Mr. Moxley's proposed interpretation—an attorney's compliance with court orders necessarily confers a reasonable basis to the case—also contradicts the outcome of Perreira. In that case, the petitioner's attorney went so far as to bring the case to a hearing, including incurring costs to present the testimony of an expert. Nonetheless, the Federal Circuit still found that the chief special master was not arbitrary in denying attorneys' fees and costs for the hearing. Perreira, 33

37

F.3d at 1375. The denial of attorneys' fees to Mr. Moxley is not less "unfair" than the denial of attorneys' fees to the attorney who represented the Perreiras.

According to the Vaccine Act as interpreted by Perreira, Ms. Chuisano is eligible for compensation for Mr. Moxley's fees only if there were a reasonable basis for the claim for Ms. Chuisano's petition while Mr. Moxley was prosecuting her claim. Like CHC-C, Mr. Moxley did not cite any evidence providing a reasonable basis for the claim that the flu vaccine contributed to Ms. D'Esposito's death. At best, Mr. Moxley refers to a discussion in which Dr. Levin told him that he (Dr. Levin) would issue a causation opinion. But, this hearsay statement was not supported with anything.[32] It cannot be true that attorneys can establish the reasonable basis of a case (and, therefore, their eligibility for payment) simply by arguing in a brief that a doctor informally promised them an opinion regarding causation. An actual expert report and testimony do not always furnish a reasonable basis for maintaining a case to hearing. Perreira, 33 F.3d at 1377. By logic, a much weaker case—one in which there is no expert report—may also fall short of the reasonable basis standard.

## CONCLUSION

When represented by CHC-C, Ms. Chuisano filed a petition claiming that flu vaccine caused her mother's death. CHC-C never submitted any evidence showing that there was a causal relationship (as opposed to a simple temporal relationship) between the vaccination and Ms. D'Esposito's death. Although Mr. Moxley took over the case, he, too, did not submit any evidence supporting Ms. Chuisano's claim. This lack of evidence precluded Ms. Chuisano from receiving compensation.

Ms. Chuisano's two law firms have requested that they be compensated for their efforts in this unsuccessful case. Ms. Chuisano becomes eligible for an award of attorneys' fees and costs upon a showing that "there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa—15(e). Here, Ms. Chuisano has not presented sufficient evidence to support a finding of reasonable basis.

---

[32] The withdrawn September 20, 2012 Fees Decision similarly noted the lack of support for what Dr. Levin allegedly told Mr. Moxley. Despite this notation, Mr. Moxley did not submit any evidence with his motion for reconsideration.

Because Ms. Chuisano did not satisfy the statute's prerequisite for an award of attorneys' fees, she cannot be compensated. Thus, her application for attorneys' fees and costs is DENIED. The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master
